UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

SHEILA R. COWAN,                           )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )        No.    1:14CV16 TIA
                                           )
CAROLYN W. COLVIN, Acting                  )
Commissioner of Social Security,           )
                                           )
                    Defendant.             )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Sheila R. Cowan's application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§

401, *et seq.* All matters are pending before the undersigned United States

Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

Because the final decision is not supported by substantial evidence on the record as

a whole, the decision of the Commissioner is reversed.

### I.  Procedural History

Plaintiff Sheila R. Cowan filed her application for disability insurance

benefits (DIB) on August 15, 2011, alleging that she became disabled on

September 17, 2007, because of back problems and hand problems.  (Tr. 132-38,

203.) On November 3, 2011, the Social Security Administration denied plaintiff's claim for benefits. (Tr. 66-76, 79-83.) Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on November 26, 2012, at which plaintiff and a vocational expert testified. (Tr. 27-65.) On January 3, 2013, the ALJ issued a decision denying plaintiff's claim for benefits, finding plaintiff able to perform work as it exists in significant numbers in the national economy. (Tr. 7-22.) On December 12, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-4.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff raises numerous claims arguing that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ failed to accord proper weight to the opinion of plaintiff's treating physician, Dr. Watkins, and erred in analyzing the credibility of plaintiff's subjective complaints. Plaintiff further contends that the ALJ's hypothetical question posed to the vocational expert failed to include all of plaintiff's established limitations. Finally, plaintiff contends that the ALJ erred in finding plaintiff not to be disabled at Step 5 of the sequential analysis inasmuch as he failed to acknowledge the shift in the burden of proof at this step and failed to resolve a conflict between the vocational expert's testimony and the *Dictionary of Occupational Titles* (DOT) with respect to the jobs

the expert testified that plaintiff could perform.  Plaintiff requests that the final decision be reversed and that the matter be remanded for further consideration. Because the ALJ erred in his analysis of plaintiff's credibility as well as other evidence of record supporting his residual functional capacity (RFC) assessment, the matter will be remanded for further proceedings.

## II.  Testimonial Evidence Before the ALJ

A.      Plaintiff's Testimony

At the hearing on November 26, 2012, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-six years of age.  Plaintiff is married and lives in a mobile home.  Her husband works in another state.  (Tr. 32-33.)  Plaintiff stands five feet, eleven inches tall and weighs 195 pounds.  Plaintiff is right-handed.  (Tr. 44.)  Plaintiff went to school to ninth grade and later obtained her GED.  She later received training to earn a commercial driver's license and she also received training to be a correctional officer.  (Tr. 33-34.)   Plaintiff has had Medicaid assistance since May 2012.  She previously received worker's compensation for her disability.  (Tr. 34-35.)

Plaintiff's Work History Report shows plaintiff to have worked as a laborer in a factory from 1999 to 2000, in 2002, and again in 2006.  From 2003 to 2005, plaintiff worked as a corrections officer in a prison.  From 2006 to 2007, plaintiff

worked as a welder in a factory. From February to March 2011, plaintiff worked as a caregiver in home health care. (Tr. 224.) Plaintiff testified that she is no longer able to work because of surgeries performed on her hands and because of back trouble caused by an accident that recently occurred in May. (Tr. 38.)

Plaintiff testified that she has had surgeries for carpal tunnel and trigger fingers and experiences pain and limitation in both hands as a result. Plaintiff also has a partial amputation of the right ring finger, with the tip having been amputated while she was in school. Plaintiff also underwent reconstructive surgery in the palm. Plaintiff testified that the pain is worse in her left hand. Plaintiff testified that the pain radiates from the palm of her hand to the fingers. She cannot straighten her fingers. Her pain is constant and worsens with cold and when she picks up, squeezes, or grabs things. Plaintiff's hands shake because of the nerve damage. Plaintiff has wrist braces that she wears in the winter months when she experiences cramping the most. (Tr. 38-40, 45-46, 48-51, 52.)

Plaintiff testified that she participated in physical therapy on a daily basis for her hand condition from 2007 to 2010 but obtained no long term benefit. She takes hydrocodone for pain every four hours, but the effect of the medication lasts for only a couple of hours. Plaintiff testified that she also gets temporary relief by soaking her hands in warm wax. Plaintiff no longer sees a physician for her hand condition because she was advised that nothing more could be done given the

extent of the tissue damage. Plaintiff testified that she drops things. Plaintiff also testified that her hand condition renders her unable to use a keyboard or perform a job that would require putting parts together or handling money because of her inability to straighten the fingers of her left hand. Plaintiff also testified that being required to perform tasks on a repetitive basis with her hands would cause too much pain. (Tr. 38-40, 45-46, 48-51, 52.)

Plaintiff testified that she injured her back the previous May when she was involved in an accident and struck a deer. Plaintiff suffered nerve damage, and she experiences pain in her low back that radiates down her left leg. Plaintiff takes medication for the condition. Plaintiff also uses a four-pronged cane because she cannot put too much weight on her left side. Plaintiff testified that recent epidural steroid injections did not help the pain. Plaintiff testified that her legs also give way because of this impairment and she has fallen on four occasions. Plaintiff recently suffered a head laceration because of a fall. (Tr. 40-43.)

Plaintiff testified that she was currently taking Vicodin in relation to recent surgery for removal of a lipoma. (Tr. 41.)

Plaintiff testified that her overall pain affects her ability to focus and pay attention because she gets stressed and aggravated when the pain stops her from doing things she should be able to do for herself. (Tr. 51-52.)

As to her exertional abilities, plaintiff testified that she can walk about

twenty-five feet before needing to stop and rest due to pain in her leg. Plaintiff can stand about fifteen to twenty minutes and sit for thirty-five to forty minutes. Plaintiff cannot bend because of her low back condition. Plaintiff also has difficulty reaching above her head because of a shock-like pain that radiates from her back. Plaintiff testified that she can lift about five pounds on a regular basis. (Tr. 43, 50.)

Plaintiff testified that her daughter visits once a week to do household chores and go to the grocery store for her. (Tr. 44.)

B.      Testimony of Vocational Expert

Jan Hatcher, a vocational expert, testified in response to questions posed by the ALJ and counsel.

Ms. Hatcher classified plaintiff's past work as a machine sorter as light and unskilled; as a coating machine operator and production welder as medium and unskilled; and as a corrections officer as medium and semi-skilled. (Tr. 53.)

The ALJ asked Ms. Hatcher to assume an individual who could perform a range of sedentary work in that she could lift up to ten pounds occasionally, stand or walk two hours per eight-hour day, and sit six hours per eight-hour day. The ALJ asked Ms. Hatcher to further assume the person could frequently engage in handling, fingering, and feeling bilaterally. Ms. Hatcher testified that such a person could not perform any of plaintiff's past relevant work but could perform

- 6 -

other work in the national economy, such as surveillance system monitor, of which 350 such jobs exist in the State of Missouri and 25,000 nationally; credit checker, of which 170 such jobs exist in the State of Missouri and 24,000 nationally; and egg processor, of which 620 such jobs exist in the State of Missouri and 27,400 nationally. (Tr. 54.)

The ALJ then asked Ms. Hatcher to assume the same individual but that she was limited to only occasional handling, fingering, and feeling, to which Ms. Hatcher testified that such a person could continue to perform work as a surveillance system monitor and credit checker. (Tr. 54.)

The ALJ then asked Ms. Hatcher to assume a person limited to sedentary work who could never handle, finger, or feel bilaterally. Ms. Hatcher testified that the DOT defined the job of surveillance system monitor as one with no significant performance of such activities. (Tr. 55.)

Ms. Hatcher also testified generally that a person could miss work for pain or other symptoms about eight to ten days a year, or less than one day a month; and that a person whose symptoms caused them to be less productive than average, such as at a rate of eighty percent or less, could not engage in competitive employment. (Tr. 55.)

In response to counsel's questions, Ms. Hatcher testified that a person requiring a sit/stand option who needed to change positions every thirty minutes

could continue to perform the jobs to which she previously testified. Ms. Hatcher further testified that a person requiring an additional fifteen-minute break in the morning and afternoon because of pain would be precluded from gainful work activity. (Tr. 61-62.)

### III. Medical Evidence Before the ALJ[1]

Plaintiff visited Dr. Troy B. Watkins, Jr., on January 30, 2008, who noted plaintiff's medical history to include experiencing symptoms in her left index finger beginning in June 2007. Plaintiff also underwent an injection to her right ring finger and to a ganglion cyst on the right wrist on July 31, 2007. Neither the trigger finger symptoms nor the cyst improved, and, on September 17, 2007, plaintiff underwent surgical release of the right trigger finger, excision of the ganglion cyst, and right carpal tunnel release. Plaintiff underwent left carpal tunnel release in November 2007, as well as surgical trigger release of the left index and middle fingers. Plaintiff now complained of recurring right ring finger symptoms as well as nighttime cramps in the palms of both hands. Flexion deformities were noted to be more of a problem. Dr. Watkins noted plaintiff to have seen a therapist and to have recently been on Medrol Dosepak. Physical

---

[1] The undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence. However, inasmuch as plaintiff challenges the decision only as it relates to her physical impairments involving her hands and her back, the recitation of specific evidence in this Memorandum and Order is limited to only that evidence relating to the issues raised by plaintiff on this appeal.

examination showed the left metacarpophalangeal (MCP) joints to be in flexion with some spasm in the hypothenar muscles. No atrophy, hypertrophy, or fasciculations were noted. Old fingertip amputation and mild clubbing of the right ring finger was noted. Plaintiff had normal range of motion about the fingers of the right hand. Plaintiff had normal flexion of her fingers of the left hand, but it was noted to be somewhat slow and deliberate. Induration of the right carpal tunnel scar and the right finger trigger release scar was noted with continued tenderness about the scars. Slightly positive Tinel's test was noted on the right. Phalen's test and nerve compression test were negative. Examination of the left hand showed induration about the scars but no triggering. Tinel's test, Phalen's test, and nerve compression test were negative. Dr. Watkins determined that plaintiff had not completely recovered from her previous surgeries with regard to soft tissue maturation. He opined that plaintiff's right hand had some intrinsic atrophy due to disuse. Plaintiff was found to no longer suffer from carpal tunnel or trigger fingers, but she had not yet reached maximum recovery. Dr. Watkins recommended that plaintiff participate in physical therapy for scar maturation and perhaps for work hardening. (Tr. 275-79.)

Plaintiff returned to Dr. Watkins on April 2, 2008. It was noted that plaintiff's surgeon, Dr. Hansen, opined that plaintiff's left hand had deteriorated to an extent such that she needed a fasciotomy, and she wanted a second opinion from

Dr. Watkins. Examination showed normal interphalangeal (IP) range of motion about all fingers but decreased extension in her index, long, and ring fingers. Plaintiff was noted to hold her left hand in a protected position with her MCP joints flexed. Decreased sensation was noted about the hand. Light touch was intact. Dr. Watkins noted plaintiff to be quite uncomfortable when he attempted to extend her fingers. Slight atrophy about the flexor tendons was noted. Plaintiff reported therapy not to be helpful, and Dr. Watkins questioned whether plaintiff was in an appropriate therapy program. Dr. Watkins opined that surgery may exacerbate the existing problem. Dr. Watkins referred plaintiff to therapist Mark Shaltry for evaluation of the soft tissue for therapy. (Tr. 280-81.)

Plaintiff visited Mr. Shaltry at Intermountain Physical Therapy & Hand Rehabilitation on April 8, 2008, for occupational therapy in relation to left Dupuytren's syndrome.[2] Plaintiff reported having undergone a trigger release in July 2007 and thereafter suffering continued problems with pain, tightness, and triggering. Plaintiff reported having partial numbness in four of her fingers, and some atrophy was noted at the tissue centrally in the palm. Plaintiff reported that she underwent therapy after her July 2007 surgery but experienced lost range of

---

[2] Dupuytren's disease is an abnormal thickening of the tissue just beneath the skin in the palm of the hand and can extend into the fingers. The condition can cause the fingers to bend into the palm. Dupuytren's Disease, *American Soc'y for Surgery of the Hand* (2015), *available at* <http://handcare.assh.org/Hand-Anatomy/Details-Page/ArticleID/27961/Dupuytren-Disease.aspx>.

- 10 -

motion and increased pain in her hand, which prompted her to seek a second opinion.  Current examination showed limited range of motion about the wrist and fingers.  Plaintiff complained of severe pain while at rest and with use.  It was noted that there was potential for further loss of range of motion and strength.  Plaintiff was noted to be guarded but motivated to try another course of therapy.  Prognosis was noted to be fair to good.  (Tr. 311-12.)[3]

Plaintiff returned to Dr. Watkins on April 14, 2008, and reported having exceedingly difficult problems.  Dr. Watkins noted that plaintiff showed improvement over the course of a therapy session with slow manipulation of the soft tissue, but that such improvement did not last.  Dr. Watkins opined that, with multiple steroid injections to the palm and the marked degree of disuse, plaintiff experienced atrophy of the muscles in the left palm.  Dr. Watkins also opined that plaintiff was not a candidate for additional surgery, given that such surgery may push plaintiff into a sympathetic dystrophy.[4]  Dr. Watkins determined to treat plaintiff as though she had dystrophy, however, with a series of stellate blocks

---

[3]  The record includes treatment notes from physical therapy through August 2008.  Plaintiff progressed with range of motion during therapy but continued to experience pain and tenderness. (Tr. 305-08.)

[4]  Reflex sympathetic dystrophy syndrome, also known as complex regional pain syndrome, is a chronic pain condition that occurs most often after injury.  The key symptom is intense and burning pain that is much stronger than would be expected for the type of injury, gets worse over time, and begins at the point of injury but may spread to the whole limb or to the limb on the opposite side of the body.  Complex Regional Pain Syndrome, *Medline Plus* (last updated Mar. 16, 2015)<http://www.nlm.nih.gov/medlineplus/ency/article/007184.htm>.

followed immediately by therapy. Dr. Watkins advised plaintiff to view her therapy as her job, noting that frequent soft tissue stretching therapy of a prolonged nature was mandatory. Dr. Watkins advised plaintiff to receive therapy three to five days a week for at least a month. (Tr. 282-84.)

On May 12, 2008, plaintiff reported to Dr. Watkins that she had less pain and significantly improved range of motion with frequent therapy sessions. Dr. Watkins noted that plaintiff's care would be transferred to him from Dr. Hansen. (Tr. 284.)

On June 4, 2008, Dr. Watkins noted plaintiff to be doing much better, with full extension of the index and little fingers and less pain associated with limited extension of the long and ring fingers. Dr. Watkins recommended that plaintiff participate in physical therapy at the end of the day so that attempts could be made to get her fingers to full extension at which time splints would be placed for plaintiff to wear at full extension all night. (Tr. 285.) On June 18, Dr. Watkins noted plaintiff to be making continued progress with her left hand with almost passive extension at the end of her therapy sessions and normal flexion noted about all of the joints of the four fingers. Plaintiff was instructed to continue with daily therapy. An inflammatory process was noted about the ring finger of the right hand, and plaintiff was prescribed Motrin. Dr. Watkins spoke to plaintiff's caseworker about the availability of light duty work for plaintiff to perform, noting

that it would need to be "one handed work and it would have to be part-time . . . based on the fact that she is doing therapy every day [and] it takes half of her day to get her therapy done." (Tr. 285-86.) On June 25, Dr. Watkins noted plaintiff to continue to improve, although she continued to feel that she had something in the palm of her hand. Dr. Watkins reported that plaintiff was unable to work because of her daily therapy. (Tr. 287-88.)

Plaintiff returned to Dr. Watkins on July 23, 2008, who noted plaintiff to be doing better. Dr. Watkins noted that, with therapy, plaintiff lacked only about fifteen to twenty degrees of extension at the MCP joint of the long and ring fingers with normal motion of the proximal interphalangeal (PIP) joints. Dr. Watkins noted the treatment regimen to be a long, drawn out process but opined that it was the proper course of action given that plaintiff was not a surgical candidate. (Tr. 288.)

On August 6, 2008, Dr. Watkins noted that, while plaintiff was making progress with therapy, the amount of pain she experienced during therapy was discouraging. Dr. Watkins advised plaintiff to discontinue therapy for a week and a half until their next visit. (Tr. 289.) On August 13, plaintiff reported to Dr. Watkins that her hand pain was slightly better but that range of motion was slightly worse. Dr. Watkins instructed plaintiff to remain off of therapy for another week but to continue to work on motion. (*Id.*) On August 25, Dr. Watkins noted

plaintiff to have been off of therapy for a month and to lack twenty-five degrees of full extension of the long finger MCP joint and a few more degrees than that in the ring finger. Plaintiff continued to complain of pain with gripping and lifting. Normal flexion was noted. Dr. Watkin continued to advise against surgery and recommended that plaintiff engage in an exercise program that involved scrubbing a tile floor with a large brush. Dr. Watkins also recommended that plaintiff keep her right hand in her pocket to force her to use her left hand for activities of daily living. (Tr. 290.)

Plaintiff returned to Dr. Watkins on September 8, 2008, who noted the condition of plaintiff's left hand to be stable but unacceptable. Dr. Watkins noted plaintiff's injury to have occurred about one year prior and that she continued to have an unacceptable amount of pain. Plaintiff had atrophy of the tissue in the area of the distal and middle palmar creases, and adhesion to the soft tissue over the ring finger at the distal palmar crease. Passive motion was better than active motion, but Dr. Watkins noted that plaintiff did not have acceptable function despite her dedication to vigorous therapy over a prolonged period of time. Although Dr. Watkins continued to be hesitant about surgery, he questioned whether plaintiff's motion would improve without some type of release. Dr. Watkins determined to contact Dr. Andy Koman, "one of the country's experts," for his opinion. (Tr. 290-91.)

On October 13, 2008, Dr. Watkins reported that he and Dr. Koman determined that a release of the soft tissues on the left side was needed but that a muscle flap and full thickness skin graft would be necessary for coverage given the atrophy of the soft tissue.  Presently, plaintiff was noted to also complain of worsening swelling over the trigger finger incision of the right hand with worsening pain.  Examination showed an abscess over the scar, which Dr. Watkins excised.  Plaintiff was prescribed Keflex and Norco and was instructed to whirlpool her hand several times a day.  (Tr. 292.)  On October 20, Dr. Watkins noted improvement about the abscess site of the right hand, but plaintiff was not completely pain free.  Dr. Watkins also noted plaintiff to be "losing a little ground" with respect to her left hand in that she was showing evidence of increased sympathetic activity.  Dr. Watkins noted plaintiff to be holding her left hand in a more flexed position, and he encouraged her to return to some activities that she participated in previously.  (Tr. 293-94.)  On October 27, Dr. Watkins noted the problem with plaintiff's right hand to have almost completely resolved.  With respect to plaintiff's left hand, Dr. Watkins opined that continued therapy or splinting would not be of any benefit.  Surgical release with muscle flap and postoperative blocking was considered.  (Tr. 294-95.)

Plaintiff underwent surgery on December 9, 2008, for release of the flexor tendons of the left hand with rotational flap.  (Tr. 269-74.)

Plaintiff visited Dr. Watkins on December 15, 2008, for follow up of surgery. It was noted that plaintiff had experienced increased inflammation over the weekend. Mild swelling was noted, but there was no evidence of overt infection. (Tr. 295-96.) On December 17, Dr. Watkins noted plaintiff's skin graft to have taken 100 percent. Plaintiff was placed into an extension splint, and she was referred to Mr. Shaltry for daily therapy to work on range of motion. (Tr. 296.) On December 22, Dr. Watkins noted plaintiff to be very encouraged about her prognosis. (Tr. 297.)

Plaintiff returned to Dr. Watkins on December 29, who noted plaintiff to have significantly improved within the week. Plaintiff could readily flex and extend her fingers, but her motion was not normal. Plaintiff was also noted to have much less pain to light touch. Dr. Watkins determined to enroll plaintiff in therapy to include whirlpool, fluidotherapy, desensitization, and early painless range of motion. Plaintiff's current stage of postoperative progress was noted to be unfortunate but not unexpected, and Dr. Watkins hoped it to be only a temporary setback. (Tr. 297.)

On January 5, 2009, Dr. Watkins noted plaintiff to no longer have the pain that previously concerned him. Plaintiff's range of motion was noted to be improving, if taken very slowly. Dr. Watkins reviewed plaintiff's hand exercises with her. (Tr. 298.) On January 12, Dr. Watkins noted plaintiff's hand condition

to have improved, with range of motion to be almost equal to what it was immediately following surgery – albeit lacking full extension. Dr. Watkins opined that they were past the point of having a sympathetic pain problem, and plaintiff was instructed to continue with therapy. (Tr. 299.) On January 19, plaintiff reported to Dr. Watkins that her hand felt better, and Dr. Watkins noted there to be increased function. Dr. Watkins reported his hope that plaintiff would be able to return to some type of job in two to two and a half months. (Tr. 299-300.)

Plaintiff returned to Dr. Watkins on February 4, 2009. Dr. Watkins noted the present examination to be the "best examination" that he had witnessed. Plaintiff had improved flexion and extension of her fingers – although not quite normal, and she had significantly less sensitivity. It was noted that plaintiff may move to another state in March given her husband's new employment, and Dr. Watkins reported that he may be able to discharge her from his care at that time. He determined to see her every two weeks until that time. (Tr. 300-01.)

On February 18, 2009, Dr. Watkins noted plaintiff to continue to improve, with range of motion slowly improving. Plaintiff expressed a desire to be discharged at the following visit so that she could move with her husband, which Dr. Watkins thought was appropriate. Dr. Watkins noted that plaintiff's motivation for improvement was significant. Plaintiff was instructed to return in two weeks. (Tr. 301.)

Plaintiff returned to Dr. Watkins on March 4, 2009, who noted plaintiff to be doing quite well although she "obviously does not have normal function in either hand." Plaintiff was noted to have a minimal amount of loss of motion in the right long and ring finger joints, normal range of motion with flexion in her left PIP joints, decreased range of motion with extension of the left ring and little fingers, and normal wrist motion. Dr. Watkins noted this to be his last appointment with plaintiff since she was moving out of state. With respect to impairment ratings, Dr. Watkins noted it to be difficult to "know how to do that" (Tr. 302-03), but he opined:

> Her loss of function in her left hand is greater than would be indicated by her loss of motion in the PIP joints. With the flap and skin graft that she had in the hand, she still does not complete[ly] achieve maturation of her scars.
>
> Her right hand, obviously, also continues to be intermittently somewhat problematic.
>
> I would offer a permanent partial impairment of 2 percent of the right upper extremity and 8 percent of the left upper extremity.

(Tr. 303.) In a job site evaluation form completed that same date, Dr. Watkins opined that plaintiff could not return to her pre-injury occupation as a welder because of her permanent restriction to no repetitive or lifting activities. Dr. Watkins further opined, however, that appropriate employment options included school bus driver, delivery driver, and security guard. (Tr. 304.)

After plaintiff's last appointment with Dr. Watkins in April 2009, the record is silent until October 31, 2011, when plaintiff underwent a consultative physical evaluation for disability determinations. Plaintiff complained to Dr. Michael D. Ball that she injured her back in 2004 and suffered a ruptured disk in the lumbar spine, resulting in chronic low back pain with radiation to the left leg. Plaintiff reported that she took medication and participated in physical therapy for the condition but continued to have low back pain with any extended sitting or standing. Plaintiff reported the need to frequently change positions to avoid low back pain. Plaintiff also reported bilateral hand pain and detailed her surgical history regarding her hands. Dr. Ball noted plaintiff to have scar tissue in the palms of both hands, decreased strength bilaterally, and restricted motion in the fourth and fifth digits of the left hand without the ability to fully extend these digits. Dr. Ball noted plaintiff to be taking hydrocodone. Physical examination showed plaintiff to have decreased grip strength bilaterally with the left worse than the right. Grip strength was measured to be 4+/5 in the right hand and 2+/5 in the left hand. Muscle atrophy was noted in both hands with the left hand worse than the right. The left thenar and hypothenar eminence showed significant atrophy.[5]

---

[5] The thenar muscle is the muscle on the palm of the hand just below the thumb that helps moves the thumb. The hypothenar muscles are a group of muscles of the palm that control the motion of the little finger. How Does the Hand Work?, *Institute for Quality & Efficiency in Health Care* (last updated Oct. 30, 2013)<http://www.ncbi.nlm.nih.gov/books/NBK279362/>.

Flexion deformity was noted at the PIP joints of the fourth and fifth digits of the left hand, resulting in restricted fine finger manipulation and grip strength. Plaintiff was also noted to have reduced strength in the upper extremities. Dr. Ball diagnosed plaintiff with bilateral hand pain with reduced grip strength bilaterally. Dr. Ball opined that plaintiff was limited in her ability to lift, carry, and handle objects because of her reduced grip strength, flexion deformity of the left hand, and scar tissue in the right hand. Dr. Ball opined that plaintiff was unable to lift and carry objects heavier than ten pounds on a frequent basis. (Tr. 316-19.)

With respect to plaintiff's back pain, Dr. Ball noted plaintiff to ambulate without an assistive device and to have normal gait and station. Deep tendon reflexes were measured to be +2/4 bilaterally. No evidence of muscle atrophy was noted. Plaintiff was able to heel and toe walk without difficulty, and straight leg raising was negative. Plaintiff had limited range of motion with flexion-extension and lateral flexion of the lumbar spine. Plaintiff was noted to have lower extremity weakness bilaterally. Dr. Ball diagnosed plaintiff with chronic lumbar pain secondary to degenerative joint and disk disease of the lumbar spine but opined that plaintiff had no restriction in her ability to stand, sit, or walk. (Tr. 316-19.)

On December 19, 2011, plaintiff visited the Poplar Bluff Regional Medical Center and complained of, *inter alia*, low back pain and pain and cramping in her hands. It was noted that plaintiff was not taking any medication. Examination

showed carpal tunnel syndrome.  Plaintiff was diagnosed with chronic pain.  It was noted that plaintiff needed an evaluation but had no insurance.  (Tr. 322.)

Plaintiff was admitted to the emergency room at Poplar Bluff Regional Medical Center on June 10, 2012, with complaints of persistent back pain radiating to the left leg with associated numbness and weakness.  Plaintiff reported having been involved in a motor vehicle accident two weeks prior.  Decreased range of motion was noted, and pain was elicited with straight leg raising on the left.  Muscle spasm was noted in the thoracic and lumbar areas as well as about the left low back and mid back.  Tenderness was noted about the cervical and lumbar spine.  X-rays of the cervical and lumbar spine were normal.  Plaintiff was given Norflex and Norco, and crutches were provided.  Plaintiff was discharged that same date in stable condition.  She was diagnosed with back pain, ligamentous strain, and lumbosacral radiculopathy.  Plaintiff was prescribed Flexeril and Vicodin upon discharge.  (Tr. 377-86.)

Plaintiff visited Dr. James Wilkerson at the Kneibert Clinic on June 12, 2012, with complaints of back, neck, and leg pain as a result of a recent motor vehicle accident.  Plaintiff reported the pain to radiate from the left lower back and buttock to the left leg and into the foot.  Dr. Wilkerson noted the recent x-rays of the cervical and lumbar spine to be normal.  Physical examination showed straight leg raising to be negative.  Plaintiff had normal strength in the upper and lower

extremities.  Dr. Wilkerson ordered an MRI, noting that he was "highly suspicious" of a herniated disk.  Hydrocodone-acetaminophen and Flexeril were prescribed.  (Tr. 336-40.)  A subsequent MRI of the lumbar spine showed mild disk bulge with small central disk protrusion and annular tear at L5-S1.  (Tr. 333-34.)  Dr. Wilkerson determined this MRI to yield negative results.  (Tr. 331-32.)

Plaintiff returned to Dr. Wilkerson on June 22 who recommended physical therapy and consultation with a neurosurgeon.  Neurontin (Gabapentin) was prescribed, and plaintiff's hydrocodone was refilled.  (Tr. 331-32.)  On June 25, plaintiff informed Dr. Wilkerson that Gabapentin caused an elevated heart rate and nausea.  (Tr. 330.)

On July 2, 2012, plaintiff underwent a neurosurgical evaluation at the Brain and NeuroSpine Clinic of Missouri, LLC.  Plaintiff reported to Dr. Howard L. Smith that she had neck pain radiating to her thoracic spine but not to the head, shoulders, or arms.  Plaintiff also reported having severe low back pain radiating to the left leg and foot.  Plaintiff reported the pain to prevent her from "doing much of anything" and that she cannot walk up stairs or put on socks.  Plaintiff rated the pain to be a level eight on a scale of one to ten.  Physical examination showed full muscle strength in all major muscle groups of the upper extremities, with partial clawing noted about the left hand.  Dr. Smith noted sensation to be decreased about the left medial three fingers.  Plaintiff had full muscle strength in all major muscle

groups of the lower extremities as well, but give way weakness was noted throughout the left leg. Pinprick sensation was decreased globally about the upper and lower extremities. Plaintiff had an antalgic gait. Plaintiff had decreased range of motion about the cervical spine in all spheres. Upon review of the diagnostic tests and physical examination, Dr. Smith diagnosed plaintiff with axial cervical pain with a suggestion of L5 radiculopathy on the left, in addition to substantial lumbago. Dr. Smith ordered flexion and extension x-rays of the cervical and lumbar spine and EMG and nerve conduction studies of the legs. (Tr. 324-28.)

Plaintiff returned to Dr. Smith on July 20 who noted flexion and extension x-rays not to show any untoward motion. Dr. Smith noted the EMG and nerve conduction studies to have been denied. Plaintiff complained of worsening pain and reported being unable to sleep because of back pain. Plaintiff reported her pain to be at a level ten. Plaintiff also reported having difficulty with headaches. Physical examination was essentially unchanged. Dr. Smith ordered an epidural steroid injection at the left L4-5 level. (Tr. 349-51, 371.)

An epidural steroid injection was administered on August 2, 2012 (Tr. 352-55), but plaintiff complained to Dr. Smith's physician-assistant on August 15 that she had worsening pain in the low back and left leg. Plaintiff reported that her legs locked up while walking the previous night, causing her to fall. Plaintiff also reported that the bottom of her left foot was numb, that she experienced numbness

in her toe, and that she had weakness in her left leg. Plaintiff reported the recent epidural injection to have provided relief for only one hour. PA Marie C. Glisson noted plaintiff to be using a walker. Plaintiff requested an increase in pain medication, advising PA Glisson that she has had to "double up" on the medication inasmuch as it was not effective. Physical examination showed moderate resistance of the tibialis anterior on the left as well as diffuse weakness in the lower legs bilaterally. Decreased pinprick sensation was noted about the L5 and S1 dermatomes. Plaintiff had an antalgic gait with a limp favoring the left. Tenderness was noted to palpation about the left sacroiliac joint and to percussion over the lumbar spinous process. No tenderness was noted about the hips bilaterally. Plaintiff's range of motion was moderately limited with flexion, lateral bending, and rotation of the thoracic/lumbar spine. Range of motion was severely limited with extension of the thoracic/lumbar spine. PA Glisson diagnosed plaintiff with radiculitis of the thoracic/lumbar spine and lumbago. Medrol was prescribed, and plaintiff's Norco was refilled but with no increase in dosage. Flexion/extension x-rays of the lumbar spine were ordered to rule out fracture and instability, but they yielded normal results. (Tr. 356-60, 361.)

Plaintiff visited Dr. Smith on August 31, 2012, and reported her pain to be worsening and to be at a level ten. Upon review of the diagnostic studies and examination, Dr. Smith advised plaintiff that her pain condition is not one that can

be treated with neurosurgery. Plaintiff was referred to Dr. Cleaver for evaluation and treatment. (Tr. 362-64.)

Plaintiff was admitted to the emergency room at Mercy St. Francis Hospital on October 10, 2012, after falling and suffering a laceration to her forehead. Plaintiff reported that her legs gave way, causing her to fall. It was noted that plaintiff was being followed by a neurologist for chronic back pain. Plaintiff was considered to be a fall risk. Laceration repair was performed and plaintiff was discharged to home that same date. (Tr. 405-20.)

On November 6, 2012, plaintiff underwent excision of a lipoma from her right upper back. At the time of the procedure, plaintiff's medications were noted to include Cymbalta, Norco, and Ultram. Plaintiff was prescribed Tylenol upon discharge to take for incisional pain. (Tr. 424-40.)

On November 20, 2012, Family Nurse Practitioner Patricia Summerford from Mercy Clinic Family Medicine ordered a four-pronged cane for plaintiff for her diagnosed condition of lumbar radiculopathy. (Tr. 402.)

### IV. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2012, and had not engaged in substantial gainful activity since September 17, 2007, the alleged onset date of disability. The ALJ found plaintiff's degenerative disc disease, status post bilateral

carpal tunnel releases, and status post bilateral trigger finger releases to be severe impairments, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ determined that plaintiff had the RFC to perform sedentary work in that she could lift or carry ten pounds occasionally and ten pounds frequently, stand or walk for two hours out of an eight-hour workday, and sit for six hours out of an eight-hour workday, with normal breaks; and could engage in frequent handling, fingering, and feeling bilaterally. (Tr. 12-14.) The ALJ determined plaintiff's subjective complaints not to be entirely credible. The ALJ found plaintiff unable to perform any of her past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff is able to perform other work that exist in significant numbers in the national economy, and specifically, surveillance system monitor, credit checker, and egg processor. The ALJ thus found plaintiff not to be under a disability from September 17, 2007, through the date of the decision and denied plaintiff's claim for benefits. (Tr. 14-22.)

## V. Discussion

To be eligible for DIB under the Social Security Act, plaintiff must prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001);

*Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If claimant's

impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and
        non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's
        impairments.

6.      The testimony of vocational experts when required which is
        based upon a proper hypothetical question which sets forth the
        claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir.

1992) (internal citations omitted).  The Court must also consider any evidence

which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at

770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  "If, after reviewing

the entire record, it is possible to draw two inconsistent positions, and the

Commissioner has adopted one of those positions," the Commissioner's decision

must be affirmed.  *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012).  The

decision may not be reversed merely because substantial evidence could also

support a contrary outcome.  *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

       To the extent plaintiff's claims challenge the manner and method by which

the ALJ determined her RFC, plaintiff contends that the ALJ erred by improperly

weighing the opinion of her treating physician, improperly discredited her

subjective complaints, and failed to include established limitations – namely, limitations regarding handling, fingering, repetitive action, holding small objects, typing and keyboarding, and using a cane.  For the following reasons, plaintiff's claims are well taken and the matter will be remanded for further proceedings.

Residual functional capacity is the most a claimant can do despite her physical or mental limitations.  *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations.  *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 404.1545(a).  Accordingly, when determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).

When evaluating the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating thereto, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions.  *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir.

2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). *See also* 20 C.F.R. § 404.1529(c)(3).[6]  When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony.  *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991).

An ALJ must do more than merely invoke *Polaski* to insure "safe passage for his or her decision through the course of appellate review."  *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir. 1995).  Instead, when making credibility determinations, "the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski*[.]"  *Cline*, 939 F.2d at 565; *see also Renstrom,* 680 F.3d at 1066; *Beckley v. Apfel*, 152 F.3d 1056, 1059-60 (8th Cir. 1998).  It is not enough to merely state that inconsistencies are said to exist.  *Cline*, 939 F.2d at 565.  While an ALJ need not explicitly discuss each *Polaski* factor, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints.  *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010).

Here, the ALJ stated in his decision that he considered plaintiff's symptoms and determined the extent they were consistent with the medical and other evidence of record as required under § 404.1529.  Other than this mere invocation

---

[6] *Polaski* and 20 C.F.R. § 404.1529(c)(3) set out identical factors for an ALJ to consider when determining the credibility of a claimant's subjective complaints.  These factors are generally referred to as the *Polaski* factors.

of § 404.1529, there is no indication that the ALJ meaningfully considered the *Polaski* factors in determining plaintiff's credibility. The matter must therefore be remanded for appropriate consideration.

Throughout the ALJ's credibility determination, the ALJ repeatedly referred to what he perceived to be a lack of objective medical evidence to support plaintiff's subjective claims. An ALJ may not discredit a claimant's subjective complaints, however, solely because they are unsupported by objective medical evidence. *Renstrom*, 680 F.3d at 1066; *Polaski,* 739 F.2d at 1322. Indeed, "objective evidence is not needed to support subjective evidence of pain." *Tome v. Schweiker*, 724 F.2d 711, 713 (8th Cir. 1984). Although the ALJ listed plaintiff's daily activities, medication, and favorable work history (Tr. 15, 19), the ALJ did not set forth how evidence of these factors was inconsistent with plaintiff's subjective complaints of pain and functional limitations. *See, e.g., Cline,* 939 F.2d at 565-66 (ALJ must clarify the basis on which daily activities are inconsistent with allegations of pain). In addition, despite alluding to a later discussion that would serve to discredit plaintiff's complaints of repeated falls and of dropping things (Tr. 15), the ALJ neither delineated nor discussed any evidence to discredit such claims. An ALJ's failure to identify specific evidence to discredit subjective complaints does not comply with *Polaski*. *Jeffery v. Secretary of Health & Human Servs.*, 849 F.2d 1129, 1133 (8th Cir. 1988); *Douthit v. Bowen*, 821 F.2d 508, 509-

10 (8th Cir. 1987).

Further, to the extent the ALJ relied on objective medical evidence to discredit plaintiff's subjective complaints, it cannot be said that such reliance is supported by substantial evidence when reviewed on the record as a whole. For instance, to the extent the ALJ noted Dr. Watkins' observed improvement of plaintiff's hand impairment during treatment, such improvement was limited in duration and did not reach the level of work-related improvement on a full time basis until February/March 2009 when Dr. Watkins expressed hope that plaintiff could return to "some type of job" and released her from further treatment. Notably, this occurred well after twelve months from when plaintiff first underwent surgery on her hands, as well as over twelve months from Dr. Watkins' first-noted observations of deformities and atrophy affecting the hands. Disability is not an "all-or-nothing" proposition. A claimant may be eligible to receive benefits for a specific period of time as long as, within that closed period, the claimant meets the definition of disability. *Harris v. Secretary of Dep't of Health & Human Servs.*, 959 F.2d 723, 724 (8th Cir. 1992); *Atkinson v. Bowen*, 864 F.2d 67, 71 (8th Cir. 1988); *Devary v. Colvin*, 5 F. Supp. 2d 1023, 1032 (N.D. Iowa 2014).

In addition, to the extent the ALJ relied on the objective results of Dr. Ball's consultative examination to support the RFC determination, the undersigned notes

Dr. Ball's report to include findings that plaintiff had decreased grip strength bilaterally, with grip strength on the left to be significantly decreased; muscle atrophy bilaterally, with significant atrophy noted about the muscles of the left hand that affected movement of the thumb and little finger; and flexion deformity about the fourth and fifth fingers of the left hand, resulting in restricted fine finger manipulation and grip strength. These objective medical findings appear to support, rather than detract from, plaintiff's subjective claims that she has difficulty gripping and holding onto things and experiences significant manipulative limitations with her hands. Plaintiff's claim of repeated falls is likewise supported by objective medical evidence from Dr. Ball in November 2011 and from Dr. Smith and his staff in July and August 2012 showing that plaintiff experiences weakness in both legs, including give way weakness in the left leg. Indeed, in November 2012, the Mercy Clinic Family Medicine ordered a four-pronged cane for plaintiff for her condition of lumbar radiculopathy. Despite this corroborative, longitudinal evidence of leg weakness and instability, the ALJ discredited plaintiff's need for a cane for the stated reasons that the medical order for its use failed to describe why it was needed and because no objective evidence showed that plaintiff required use of a cane for a period exceeding twelve months. (Tr. 17.) These reasons to discount plaintiff's need for a cane demonstrate the ALJ's failure to consider the evidence of record as a *whole*. An ALJ may not rely

on isolated references to the record when determining the credibility of a claimant's subjective complaints. *See Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2001).

In light of the above, it cannot be said that the ALJ demonstrated in his written decision that he considered all of the evidence relevant to plaintiff's complaints or that the evidence he considered so contradicted plaintiff's subjective complaints that plaintiff's testimony could be discounted as not credible. *Masterson*, 363 F.3d at 738-39. As such, the ALJ's adverse credibility determination is not supported by substantial evidence on the record as a whole. Because the ALJ's decision fails to demonstrate that he considered all of the evidence before him under the standards set out in *Polaski*, this cause should be remanded to the Commissioner for an appropriate analysis of plaintiff's credibility in the manner required by and for the reasons discussed in *Polaski*.

Where an ALJ errs in his determination to discredit a claimant's subjective complaints, the resulting RFC assessment is called into question inasmuch as it does not include all of the claimant's limitations and restrictions. *See Holmstrom*, 270 F.3d at 722. A vocational expert's testimony given in response to a hypothetical question based upon such a flawed RFC and that does not include all of a claimant's limitations cannot constitute sufficient evidence that the claimant is able to engage in substantial gainful employment. *Id.*; *Lauer v. Apfel*, 245 F.3d

700, 706 (8th Cir. 2001). Given the ALJ's flawed credibility analysis here and thus the resulting faulty RFC assessment, it cannot be said that the hypothetical question posed to the vocational expert contained all of plaintiff's credible functional limitations. As such, the ALJ erred in his reliance on the expert's testimony in determining plaintiff not to be disabled. *Holmstrom*, 270 F.3d at 722.[7]

On remand, the Commissioner shall reassess plaintiff's credibility and reweigh the medical opinion evidence of record in determining plaintiff's RFC. Inasmuch as a claimant's RFC is a medical question, and some medical evidence must support the ALJ's RFC determination, *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010), the Commissioner is encouraged here upon remand to obtain additional medical evidence that addresses plaintiff's ability to function in the workplace, including her ability to engage in specific manipulative functions. Such reconsideration of the evidence of record shall also include a determination as to whether the effects of plaintiff's impairments met the definition of disability for any specific period of time prior to the expiration of her insured status.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

---

[7] Because the matter will be remanded for a reassessment of plaintiff's RFC, which occurs at Step 4 of the sequential analysis, *Eichelberger,* 390 F.3d at 591, plaintiff's other claims of error that occurred at Step 5 of the ALJ's analysis will not be addressed here.

**REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE


Dated this 27th day of March, 2015.